## In re Appropriation for Hwy. Purposes of Lands of Lunsford et al.

132

*Mr. William B. Saxbe,* attorney general, *Mr. Harold B. Talbott* and *Mr. Allan D. Dobnicker,* for appellant Director of Highways.

*Messrs. Koch & Koch,* for appellee landowner.

Cole, J.   This is a case involving the appropriation by the state of Ohio for highway purposes of some fourteen lots, parts of three others, and part of a street in a platted subdivision.  The subdivision had been platted and the plat recorded October 31, 1963; the streets therein had been dedicated but had not been accepted as county or township roads.  The streets, however, have been laid out and graded with five or six inches of gravel.  In the center of the plat was a lake reserved for recreational purposes, and this had been worked over and developed.  Drainage tile had been installed.

One lot had been sold off the north tier of lots, which was the same tier of lots taken by the state.  The construction of one house on a lot not in this tier of lots had been completed, and another was partially finished.

The date of taking was October 23, 1967.  The first expert witness for the landowner testified as to the value of the land taken and predicated his opinion on comparable sales of lots in the vicinity without water and sewage facilities, adjusted by a factor to cover costs of sale and the period of time over which it was estimated such sales of individual lots could be made.  The value of the lots taken, thus determined, was totaled to arrive at the total value of the land taken.

The same method was used to arrive at the value of the whole allotment prior to the taking.

The second expert witness for the landowner used much the same method with this variance: no adjustment factor appears to have been considered in the value of the lots taken; an adjustment factor of 10 per cent for delayed sales was used in calculating the value of the whole allotment prior to the taking.

The counsel for the state moved to strike the testimony of both witnesses at the close of the landowner's case on the ground that the method of appraisal was erroneous as a matter of law. This was overruled. Objection was also raised to the refusal of the trial court to give a requested charge and a general exception was made to the court's charge to the jury.

The basic issue involved in all three assignments of error concerns the method of appraisal. It is contended that both witnesses simply multiplied a unit figure per lot by the number of lots to arrive at the value of the land taken, the value of the whole subdivision before the taking, and the value after the taking; and that this does not as a matter of law arrive at the fair market value.

In Ohio the owner of land taken by appropriation proceedings is entitled to compensation for land taken and for damages to the residue, if any. The measure of damages is fair market value used both to determine the value of the part taken and also to determine the basis for damages.

In 19 Ohio Jurisprudence 2d 542, Section 124, it is said:

"* * * Generally speaking, therefore, where part of a parcel of land is taken for public use, the measure of compensation and damages is the difference between the value of the whole land immediately before, and the value of the remaining part immediately after, the taking. The difference in what the residue would sell for, with or without the part appropriated, is the measure of damages to the residue."

To ascertain this, the fair market valuation is customarily defined as follows:

" 'Market value' means fair market value, and 'fair

market value' is the price which would be agreed upon at a voluntary sale by an owner willing to sell to a purchaser willing to buy. * * *'' *Preston, Dir.,* v. *Stover Leslie Flying Service, Inc.,* 174 Ohio St. 441, 450.

In arriving at fair market value so defined the jury should consider the highest and best use for which the land is reasonably adapted.

In *Board of County Commissioners* v. *Thormyer,* 169 Ohio St. 291, the Supreme Court stated, at page 297:

"This court has held that (a) in determining the value of land in an appropriation proceeding, the question to be determined is the worth of the property for any and all uses for which it may be suitable, including the most valuable use to which the land can lawfully, reasonably and practically be adapted. * * *''

Paragraph three of the syllabus of *Sowers, Supt.,* v. *Schaeffer,* 155 Ohio St. 454, reads as follows:

"The rule of valuation in a land appropriation is not what the property is worth for any particular use but what it is worth generally for any and all uses for which it might be suitable, including the most valuable uses to which it can reasonably and practically be adapted."

In the opinion in *Sowers* it is said at page 458, "The true value of anything is what it is worth when applied to its natural and legitimate uses—its best and most valuable uses."

That case dealt with the valuation of a property used for recreation, summer home and permanent home purposes. Some twenty-five persons had residence on the property and an interest therein. The issue dealt both with the mode of valuation and the allocation of the award among those holding property rights. The court concluded, at page 464:

"* * * The property owners in the instant case were entitled to present evidence as to values of all structures upon the land taken, the rental values of the same, the kind of businesses adaptable to the premises and every feature, both usual and unusual, in connection with the property and to have the jury instructed that it could take all these

elements into consideration in fixing the value of the premises as a whole, and that it was justified in assessing compensation in accord with the most valuable uses to which the property could reasonably and practically be put. However, the jury should not have been told it could return a verdict in excess of the value of the tract as a whole. * * *''

The issue presented by the state's objection to the mode of valuation utilized by the appraisers for the landowner presents primarily a problem as to the highest and best use for the property herein involved. In this case the land was not merely suitable for subdivision purposes. The process of subdivision, platting, recording and development had progressed to the point where the individual lots were available as separate units for sale. One lot had been sold. Two others had had homes built or partially built upon them for sale. There were available, as testified to by the appraisers, lots, the sales of which were comparable to these in that there were no sewers and no centralized water system. In short, a valuation of each lot was practical and available.

To insist that the land must be appraised as a whole without reference to individual lot values would, in effect, deprive the owner of a valuation of the highest and best use of the land as individual residence lots and force him to value the land merely as land available for subdivision purposes. Land which is thus divided and presently suitable for sale as individual lots to many buyers would have a higher market value than land which is merely currently suitable for sale as one tract to a single person who would in turn subdivide or develop the land for sale to others. Such a single buyer would have to consider factors of risk which individual lot buyers would not have to recognize.

Therefore, although the question for the jury is the fair market value of the tract as a whole, evidence as to the individual lot values would be both pertinent and necessary to a consideration of the highest and best use of the land.

. However, the value of the whole parcel would not be the simple mathematical total of the individual lot values. Except in the event of a rare and highly promoted auction

sale taking place in a single day, a subdivision is ordinarily sold to a multiplicity of buyers over a period of years. This factor of time must be considered, to arrive at the fair market value on the single day of taking.

How may this be done? One way is exemplified by the present case. Experts render an educated opinion based on comparable sales of similarly sized and improved tracts to individual purchasers to arrive at the aggregate price which the lots would sell for if willingly sold to individual willing purchasers irrespective of the time factor—*i. e.,* what all lots would sell for to individual purchasers. Then a discount factor based upon the expert's opinion as to the anticipated period it would take to effect such individual sales would be applied, which would on the average correct for the difference between present and deferred receipt of purchase price and for costs of sale not expended.

We do not conclude that evidence of a sale of all the lots to one buyer would not be proper in certain factual situations where evidence of a market for such sale is available but do conclude that the procedure here used, in the light of the evidence here offered and received, is proper.

This mode of appraisal does not involve future profits. The landower is entitled to his highest and best use—the sale to individual lot owners of the lots for residential purposes. The lots are appraised by using comparable sales of lots of similar size and development to obtain, not some future market value, but the value of each lot on the day of taking. No profit factor is involved. And the discount factor allows for the customary costs of sale to many individuals and for the present value of money as opposed to its future value as outlined above.

It is also objected that the witnesses, in arriving at damages to the residue, considered the reduction by a third of the whole number of lots in the subdivision. They testified that one factor in their determination of the value of the whole after the taking was the increased pro-rata share of the cost of future improvements.

If we posit a single buyer for the whole allotment, al-

though a willing seller would probably not be concerned after the taking or before with the future costs of improvements, it is of concern to a willing buyer. Whether he would further develop the subdivision or simply sell the lots "as is" would be a factor in arriving at the price he was willing to pay. If, after the taking, improvements would cost roughly the same but there remained only two-thirds of the number of lots over which to spread the cost, this would be a consideration in arriving at his decision to buy at a given price.

If we posit numerous individual purchasers, we arrive at a similar conclusion. All of the lots after the take are on a single, roughly circular, street. Improvement of the street or the later installation of sewer or water lines for the lots on this street would be a factor considered by a buyer of an individual lot, and the removal of fourteen lots along one side and parts of others would reduce the number of lots available to bear the mutual cost by agreement or by special assessment. This would, again, affect judgment and decision as to price.

In *Masheter, Dir. of Hwys.,* v. *Yake,* 9 Ohio App. 2d 327, this court said, at page 332:

"* * * Every element that can fairly enter into the question of value, and which an ordinarily prudent business man would consider before forming judgment in making a purchase, enters into the determination of market value, and thereby into the determination of damages. * * *"

Costs of future improvements were here not considered as affecting any question of future profits, but as affecting the judgment of a prudent, willing purchaser in determination of present market value after the taking.

The other two assignments of error are not well taken. The charge requested by the state failed to include a willing seller in its terms. The objection to the general charge is not well taken. We find no error of commission by the trial court in its charge, and no specific error of omission was called to the attention of the trial court.

It is necessary to add that another issue was inherent

in this case. As an allotment develops, as it progresses from open land to individual lots, there comes a point where the lots not only can be but must be considered as separate entities. When this point arrives and a part of the allotment only is taken, consisting of a number of lots, the question arises as to what is·the remaining land to which damage may occur. Is it the whole remaining subdivision, or is it just the fragment of an individual lot not taken?

"Whether certain lots, taken by appropriation proceedings, constitute part of an entire tract so as to entitle the owner of the remaining contiguous lots to damages within the rule is principally a question of unity of use and, as such, constitutes a factual matter to be determined by the jury under proper instructions. * * *" 19 Ohio Jurisprudence 2d 499, Section 92. See *Deercreek Local Board of Edn.* v. *Payne*, 86 Ohio App. 319; 6 A. L. R. 2d 1197.

In the instant case an ambiguity exists as to whether the subdivision had progressed to the point where the unity of use had ceased and the lots would be considered discrete entities. No objection, however, was made to the court's charge or any request made that the issue be given to the jury.

Since both parties, from the commencement of the case, treated the remainder of the allotment as the residue and no request was made to the court to charge upon it, the issue may be deemed to have been, in this case, waived.

*Judgment affirmed.*

GUERNSEY, P. J., and BROWN, J., concur.

BROWN, J., of the Sixth Appellate District, sitting by designation in the Third Appellate District.